## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHER DISTRICT OF OHIO
### WESTERN DIVISION

Kenneth J. Hague,                         :            Case No. 3:13 CV 2677

     Plaintiff,                         :

v.                                        :

Allstate® Insurance Company,              :

                                                   **REPORT AND RECOMMENDATION**

     Defendant.                         :

### I. INTRODUCTION.

Pursuant to 28 U.S.C. § 1441, this case was removed from the Lucas County Court of Common Pleas on the basis of jurisdiction conferred by 42 U. S.C. § 1332(a).  The case was referred to the undersigned United States Magistrate for general pretrial supervision.  Pending is Defendant's Motion for Summary Judgment (Docket No. 21)  which Plaintiff f opposes (Docket No. 27). Defendant has also filed a Reply (Docket No. 28).  For the reasons that follow, the Magistrate recommends that the Court grant the Motion for Summary Judgment.

### II. THE PARTIES.

Plaintiff, a resident of Toledo, Lucas County Ohio, owned a residence located at 1410 Pinewood Avenue, Toledo, also identified as parcel number 02-28137 (the Residence) (Docket No. 1-1, ¶ 1).

Defendant, a corporation with its principal place of business in the State of Illinois, insured the Residence from April 5, 2012 through November 3, 2012 (Docket No. 1-1, ¶ 2).

### III. FACTS.

**A.     PLAINTIFF'S STATEMENT.**

On December 28, 2012, Plaintiff Kenneth J. Hague, also known as Kenneth Braswell (his mother's maiden name), was 26 years of age.  Plaintiff withdrew from high school during the ninth grade.  Admittedly he had difficulty with reading comprehension (Docket No. 21-3, pp. 43, 67, 93 of 345).

Plaintiff recalled that he started working at 15 years of age in the food market industry, initially obtaining employment at Farmer Jack and Foodtown grocery stores.  He was later employed in the construction and the food services industries (Docket No. 21-3, pp. 44-45 of 345).  A self proclaimed "hustler," Plaintiff supplemented his income with wages from "on call" employment at his father's clothing store (Docket No. 21-3, pp. 50-51,113 of 345).

In March 2012, Plaintiff paid $6,229.23[1] in cash for the purchase of the Residence (Docket No. 21-3, pp. 32-33, 74-75, 77, 79, 279 of 345).  Plaintiff tendered his annual premium of $1,635.23 to Defendant and the binder became effective on April 5, 2012[2] (Docket No. 21-3, pp. 92-93, 108, 109, 119, 233 of 345).

Plaintiff made improvements to the Residence, including the installation of a new bathtub, kitchen floor and doors throughout the house (Docket No. 21-3, pp. 81-82, 89-90, 205 of 345).  Plaintiff decorated the house with, *inter alia*, a new 3-piece cream furniture set and a new refrigerator (Docket No. 21-3, pp. 89-90, 205 of 345).  Because his identity had been used to

---

[1]    This one story house was built in 1892, has 5 rooms totaling 1,126 square feet, detached garage, basement and a screened in porch.  For tax purposes, the house is valued at $16,500 (Docket No. 21-3, pp. 109, 279 of 345).

[2]    According to the dwelling profile, the cost to replace Plaintiff's home was $160,133, the limits of liability for personal property loss were $120,100 and water back up coverage was limited to $5000 (Docket No. 21-3, pp. 233-237 of 345).

establish utility accounts for friends and family, Plaintiff's utilities at the Residence, including the electric, gas and water accounts, were not established in his name. Instead, he used the names of his friends (Docket No. 21-3, pp. 83-84 of 345).

On September 9, 2012, someone forcibly entered the Residence, stealing Plaintiff's jeans, shirts, shoes, a PlayStation 3 console, three controllers and video games (Docket No. 23-1, pp. 282-283, 285-286 of 345). Plaintiff's Samsung 42 inch television set was destroyed during the course of the burglary. Defendant reimbursed Plaintiff to the extent that he provided proof of loss (Docket No. 21-3, pp. 54-55, 56, 57, 287 of 345). Plaintiff was required to obtain a bank account to cash his reimbursement check (Docket No. 21-3, p. 124 of 345).

On November 3, 2012, the day of the fire, Plaintiff woke up between 3:30 and 4:00 P.M., "lounged around," watched television, cooked some noodles, ironed his clothes and conducted a minimal amount of business (Docket No. 21-3, pp. 164-165 of 345). At approximately 9:00 P.M., Plaintiff left his residence, using his keys to secure the deadbolts (Docket No. 21-3, pp. 164, 170 of 345). Plaintiff met Antwon or Antuan Zimmerman at Dollar General and they ultimately went to the Empire nightclub (Docket No. 21-3, pp. 25, 180-183 of 345; Docket No. 27-1, ¶s 4 & 5). Plaintiff left the Empire nightclub and went to the Jesse James West Bar where he remained until approximately 2:30 A.M. (Docket No. 27-1, ¶ 6). Plaintiff claimed that he returned home at approximately 3:00 A.M., only to witness the aftermath of a fire that had rendered his Residence uninhabitable (Docket No. 21-3, p. 182 of 345; Docket No. 27-1, ¶ 7).

Plaintiff claimed that he did not remove any personal property prior to the fire (Docket No. 23-1, pp. 186-187 of 345). Rather, his furniture, jewelry, television, DVD player and clothing perished in the fire (Docket No. 23-1, pp. 185-186, 187-188, 206 of 345). Plaintiff

claimed that he had not smoked in the house on the day of the fire and he had no gasoline, cleaning solvents or accelerants in the garage.  To the best of his knowledge, Plaintiff was "cool" with his neighbors and he could not identify anyone who disliked him (Docket No. 21-3, pp. 185-186 of 345).

On November 4, 2012, Plaintiff filed a claim with Defendant and was informed that an investigation would follow.  On November 6, 2012 and November 8, 2012, Plaintiff met and/or talked to an investigator, and on December 6, 2012, he received an advance on his claim (Docket No. 27-1, ¶s 9-12).  Plaintiff did not receive payments in January and February 2013 and on March 25, 2013, he was informed that the claim was being denied based upon alleged breach of contract and fraud (Docket No. 27-1, ¶s 13 & 14).

**B.** **THE INVESTIGATION.**

**1**. **TOLEDO FIRE DEPARTMENT (TFD).**

TFD arrived at the House on November 4, 2012, to extinguish a fire.  TFD forced entry into the front door, controlled the fire and maintained and preserved as evidence the integrity of the windows (Docket No. 21-4, ¶s 3 & 4).  Fire investigator Glen Frames conducted an investigation into the origin and cause of the fire and determined that the fire was intentionally set (Docket No. 21-4, ¶s 2 & 5).

**2.** **SPENCER CONSULTING SERVICES (SCS).**

On November 5, 2012, Allstate® retained SCS, a private company that specializes in the investigation of the origin and causes of fire losses.  With Plaintiff's consent, Rick Spencer, a certified fire investigator, reviewed the scene of the fire on November 6, 2012, and determined the following:

1. The area under and above the mattresses revealed no sources of potential fire

4

ignition factors, such as electric extension cords, appliances, clothes iron, open flame producing devices, electric or fuel fired heater remains in the room of origin or ignitable liquids.  The ceiling fan assembly in the kitchen was also ruled out as a fire cause (Docket No. 21-5, ¶s 9 & 11).

2. A systematic examination of the sResidence revealed a single area of fire origin near a mattress spring assembly located on the floor at the north wall in the northwest bedroom (Docket No. 21-5, ¶ 7).

3. The mattresses were ignited by human action and the flame activity passed upward and outward along the walls to the ceiling, through a common closet, through the southwest bedroom and through the kitchen ceiling (Docket No. 21-5, ¶s 9 & 10).

4. The probable cause of the subject fire was an intentional human act caused by two surfaces of two mattresses at the northwest bedroom ignite and develop flame activity (Docket No. 21-5, ¶ 15).

5. The fire at the Residence was incendiary in origin and set by human hand (Docket No. 21-5, ¶ 16).

**3.  THE ALLSTATE® INVESTIGATION.**

On November 8, 2012, senior claim service consultant in Defendant's special investigation unit, Victoria L. Hoenigman, took Plaintiff's statement (Docket No. 21-2, ¶ 3-5). Ms. Hoeningman concluded that:

1. "Antuan Zimmerman," Plaintiff's alibi witness, was a convicted felon and he was incapable of being identified and located (Docket No. 21-2, ¶ 9-11, 13)

2. Plaintiff had given access to the person or persons involved in starting the fire (Docket No. 21-2, ¶ 8).

3. Plaintiff failed to provide documentation in support of his claim for contents loss (Docket No. 21-2, ¶ 17).

4. Plaintiff had substantial child support arrearages and unpaid back taxes (Docket No. 21-2, ¶ 19).

5. Plaintiff's gas bill was in the name of Michael D. Parcher (Docket No. 21-2, ¶ 21).

6. A telephone bill was in the name of Jamaar Haguei, an alleged alias (Docket No. 21-2, ¶ 22; http://lcapps.co.lucas.oh.us/onlinedockets).

7. The water bill for the Residence was in Plaintiff's name but it, too, was in arrears (Docket No. 21-2, ¶ 23).

8. Plaintiff was convicted of carrying a concealed weapon and a community control violation (Docket No. 21-2, ¶ 21; http://lcapps.co.lucas.oh.us/onlinedockets).

9. Plaintiff had the "primary motive, the exclusive opportunity, and the means to have set the fire" at the Residence because he misrepresented his involvement in setting an incendiary fire and his whereabouts at the time the fire was set (Docket No. 21-2, ¶ 26).

5

4. PRIVATE INVESTIGATOR.

Retained for the sole purpose of identifying and locating Antwon or Antuan Zimmerman, John A. Pezzino neither located, identified or spoke to Mr. Zimmerman.  During his search for Mr. Zimmerman, Mr. Pezzino obtained information from a neighbor who elected to remain anonymous, that Plaintiff's residence was virtually unoccupied at night and it was a hub for activity during the day (Docket No. 21-6, ¶s 4 & 5).

IV. PROCEDURAL BACKGROUND.

The case was originally filed in the Lucas County Court of Common Pleas and removed by Defendant to federal court.  Defendant filed the Notice of Removal and its Answer to the Complaint simultaneously (Docket No. 1 and 4).  The case was referred to the undersigned Magistrate Judge and discovery deadlines were established.  Defendant filed a Motion for Summary Judgment accompanied by Affidavits of Victoria L. Hoenigman (Exhibit 2), Kenneth J. Hague (Exhibit 3), Glen Frames (Exhibit 4), Rick Spencer (Exhibit 5) and John A. Pezzino (Exhibit 6) (Docket No. 21).  Plaintiff opposed the Motion for Summary Judgment which he supplemented with his own Affidavit (Docket No. 27).

V. MOTION FOR SUMMARY JUDGMENT STANDARD OF REVIEW.

A motion for summary judgment is reviewed under the standard that summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Martin-Dobson v. Hall*, 2014 WL 2117513, *2 (M.D.Tenn.,2014) (*citing* RULE 56(a) of the FEDERAL RULES OF CIVIL PROCEDURE; *See also Celotex Corporation v. Catrett*, 106 S.Ct. 2548, 2552 (1986)).  A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party.  *Id.* (*citing Anderson v. Liberty Lobby*, 106 S.Ct. 2505, 2510 (1986)).

6

In considering whether summary judgment is appropriate, the Court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Id.* (*citing Sowards v. Loudon County*, 203 F.3d 426, 431 (6th Cir. 2000), *cert. denied*, 121 S.Ct. 179 (2000)). In reviewing a motion for summary judgment, the Court must view the evidence and all inferences drawn from underlying facts "in the light most favorable to the party opposing the motion." *Id.* (*see Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 106 S.Ct. 1348, 1356 (1986); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) *cert. denied*, 122 S.Ct. 217 (2001)).

The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Id.* (*citing Anderson*, at 2519). However, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.' " *Id.* (*citing Hayes v. Equitable Energy Resourcs Company*, 266 F.3d 560, 566 (6th Cir.2001) (*quoting Celotex*, 106 S.Ct. at 2553).

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Id.* (*citing Goins v. Clorox Company*, 926 F.2d 559, 561 (6th Cir.1991)). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Id.* (*citing Banks v. Wolfe County Board of Education*, 330 F.3d 888, 892 (6th Cir.2003)). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *Id.* (*see Lujan v. National Wildlife Federation*, 110 S.Ct. 3177,

7

3188 (1990)).  In other words, to defeat summary judgment, the party opposing the motion must

present affirmative evidence to support his or her position; a mere "scintilla of evidence" is

insufficient.  *Id.* (*citing Bell v. Ohio State University*, 351 F.3d 240, 247 (6th Cir.2003) (*quoting*

*Anderson*, 106 S.Ct. at 2512).

## VI. DISCUSSION.

### 1. ALLEGED BREACH OF CONTRACT CLAIM FOR DEFENDANT'S REFUSAL TO PROVIDE COVERAGE.

Defendant asserts that it has no obligation to pay Plaintiff's claim under the terms of the

policy because Plaintiff's breach was material.  Moreover, he failed to produce certain

documents requested during the investigation, thereby violating the policy provision requiring

that Plaintiff cooperate with the investigation.

An insurer may be reasonably justified in denying an insured's claim for fire damage

when there is sufficient evidence that the insured committed arson to obtain the claim proceeds.

*Corbo Properties, Ltd v. Seneca Insurance Company, Incorporated*, 771 F.Supp.2d 877, 887

(N.D.Ohio,2011) (*See Zoppo v. Homestead Insurance Company*, 71 Ohio St.3d 552, 555, 644

N.E.2d 397, 400 (1994); *Thomas v. Allstate Insurance Company*, 974 F.2d 706, 711–712 (1992)).

The elements of arson are:  (1) a fire of incendiary origin; (2) motive to cause the fire; and (3)

opportunity to cause, or participate in causing, the fire.  *Id.* (*See Caserta v. Allstate Insurance*

*Company*, 14 Ohio App.3d 167, 169, 470 N.E.2d 430, 433 (1983); *Thomas*, *supra*, 974 F.2d at

711).  Circumstantial evidence is sufficient to reasonably conclude that an insured committed

arson to collect on an insurance policy; nevertheless, there still must be sufficient evidence of

all three elements of arson.  *Id.* (*See Caserta*, *supra*, 14 Ohio App.3d at 171, 470 N.E.2d at 435;

*Randle v. Allstate Indemnity Company*, 649 F.Supp.2d 675, 678 (N.D.Ohio 2009)).

8

In order to grant Defendant's Motion for Summary Judgment, this Court must find that even after viewing all of the evidence and making all reasonable inferences in a light most favorable to Plaintiff, Defendant had a reasonable basis to deny Plaintiff's claim.  Plaintiff's main argument is that there was no direct evidence of arson.  Plaintiff offered an alibi–"I was out partying when the fire was set"– and he points out that he lost all of the fixtures to the House, furniture and personal property in the fire.  Furthermore, Plaintiff contends that his cooperation with investigators fulfilled his obligations under the insurance contract.

The strength of Plaintiff's argument is diminished by Defendant's offer of evidence that the fire was not of accidental or natural causes.  Fire investigator Frames conducted an investigation into the origin and cause of the fire.  As a result, he had a reasonable and articulable suspicion that the fire was intentionally set.

Rick Spencer corroborated Mr. Frames suspicions by bringing a scientific method into the fire investigation process, providing credible and reliable evidentiary bases for determining the origin and cause of a fire.  Included in his review was the finding that  the cause of the fire as being intentionally ignited under circumstances in which the person knew that the fire should not be ignited, distinguishing this fire from a cause that failed to involve intentional human action.

The private investigator had reasonable suspicion of criminal activity at the Residence based upon the traffic patterns in and out of the house and the time of this activity.  His conclusions expressed indirectly that such suspicious activity could lend itself to a suspicious fire.

Plaintiff was unable to refute Mr. Spencer's findings that the fire was incendiary, having started in the bedroom of the locked and secure Residence.  The Magistrate is persuaded that the

first prong–fire of incendiary origin– has been satisfied.

Inquiries into whether Plaintiff was in a stable financial posture, while largely circumstantial and speculative, are material to the issue of motive. Replacement value of the Residence was $160,000.  As the investigators pointed out, Plaintiff had a precarious financial situation.  He had a limited and questionable source of income.  His property taxes, utility bills and child support were in arrears.

Plaintiff admitted that the only keys to the House were in the sole possession of Plaintiff and that Plaintiff stated that the doors were locked when he left the House.  The TFD's report confirmed that the Residence was locked at the time of the fire and there was no evidence of unauthorized or forced entry to doors or windows of the Residence.  Plaintiff has always maintained that he and "Antwon Zimmerman" visited the Empire nightclub and the Jesse James West bar at the time of the arson.  The fire's origin was suspicious, starting in the mattresses, passing upward and outward along the walls, through a common closet and through the kitchen ceiling to multiple locations within the dwelling.  There was no fire debris which suggested use of fire ignition factors.  Logic dictates that if an incendiary fire occurs inside a locked building with no signs of forced entry, then the arson was committed by Plaintiff or caused to be committed by Plaintiff's agent, both of whom had motive and opportunity to burn the House.

The evidence gathered by Defendant in its investigation gives rise to a reasonable determination that Plaintiff was responsible for the fire as it was incendiary in nature, that he had a financial motive for setting the fire and that there were no signs of forced entry as Plaintiff possessed the only keys to the House.  Defendant has met the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for Plaintiff.

Plaintiff, on the other hand, has failed to produce evidence which tends to show that

10

Defendant had no reasonable justification for refusing the claim or that its denial was arbitrary and capricious.  For the reasons set forth above, Defendant has met its burden of proof of showing that its denial of Plaintiff's was based upon a reasonable justification.

      **2.**        **MISREPRESENTATIONS DURING THE POST-LOSS INVESTIGATION**.

Defendant argues that it properly denied Plaintiff's claim because Plaintiff made material misrepresentations during the post-loss investigation.  Defendant contends that the company denied Plaintiff's claim based on the following policy language:

> . . . We may cancel this policy for material misrepresentation, fraud or concealment of material facts in presenting a claim, or violation of any of the policy terms (Docket No. 1-1, p. 21 of 57).

"Concealment or fraud clauses are fully enforceable under Ohio law."  *McCurdy v. Hanover Fire & Casualty Insurance Company*, 964 F. Supp.2d 863, 869 (N.D.Ohio,2013) (citations omitted).  In order to void the contract due to fraud or concealment, the misrepresentation must be material.  *Id*. at 869-870.  "[A] misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented."  *Id.* (*citing Latimore v. State Farm Fire and Casualty, Company*, 2012 WL 3061263, at *4 (N.D.Ohio 2012) (*quoting Abon, Ltd. v. Transcon Insurance Company*, 2005 WL 1414486, *13 (Ohio App.Ct. June 16, 2005 ), in turn *quoting Long v. Insurance Company of North America*, 670 F.2d 930, 934 (10th Cir.1982)).  The subject of the misrepresentation "need not ultimately prove to be significant to the disposition of the claim, so long as it was reasonably relevant to the insurer's investigation at the time."  *Id.* (*citing Abon*, 2005 WL 1414486, at *13).  The materiality of a misrepresentation is a mixed question of law and fact that under most circumstances should be determined by the trier of fact.  *Id.*

In the context of Defendant's post-loss investigation, the materiality requirement is

11

satisfied if Plaintiff's misdirection concerns a subject relevant and germane to Defendant's investigation as it was then proceeding.  Defendant attached importance to the fact that during the investigation, Plaintiff provided a perfunctory description of his alibi witness, Mr. Zimmerman, but he was never able to provide a working telephone number for Mr. Zimmerman or produce Mr. Zimmerman for questioning.

It thus appears that materiality of Plaintiff's evasiveness is not determined by whether or not the statements he made dealt with a subject matter later determined to be unimportant because the fire and loss were caused by factors other than those with which the statements dealt. Rather, Plaintiff's statements about Mr. Zimmerman are material because they might have affected the course of Defendant's investigation.  The statements about Mr. Zimmerman are equally material if they may be said to have been calculated either to discourage, mislead or deflect Defendant's investigation away from any area that might seem to the investigator, at that time, a relevant or a productive area to investigate.

There are no significant factual discrepancies as to whether Plaintiff was responsible for giving the investigators useless information; consequently, there is no jury question as to Defendant's ability to defend against the claim on the basis of misrepresentation.  Defendant is entitled to judgment as a matter or law on the claim of misrepresentation.

### 3.    BAD FAITH.

Plaintiff has alleged that Defendant evinced bad faith in the discharge of its contractual duty by delaying payment and denying the claim.  Defendant argues that Plaintiff does not state a claim of bad faith for the simple reason that notwithstanding the material misrepresentation claim, it had ample grounds on which to deny Plaintiff's claim.

"[A]n insurer has the duty to act in good faith in the handling and payment of the claims

12

of its insured.  *McCurdy, supra*, 964 F. Supp. 2d at 874.  An insurer fails to exercise good faith in processing an insurance claim when "its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor."  *Corbo Properties, Ltd v. Seneca Insurance Company, Incorporated*,  771 F.Supp.2d 877, 887 (N.D.Ohio,2011) (*citing Zoppo v. Homestead Insuranc*e *Company*, 71 Ohio St.3d 552, 554, 644 N.E.2d 397, 400 (1994); *Rose v. Hartford Underwriters Insurance Company*, 203 F.3d 417, 421 (6th Cir.2000)).  Denial of a claim is not reasonably justified when it is done arbitrarily and capriciously.  *Id.* (*See Hoskins v. Aetna Life Insurance Company*, 6 Ohio St.3d 272, 277, 452 N.E.2d 1315, 1320 (1983); *Thomas v. Allstate Insurance Company*, 974 F.2d 706, 711 (6th Cir.1992)).  However, denial of a claim may be reasonably justified when "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim."  *Id.* (*citing Tokles & Son v. Midwestern Indemnity Company*, 65 Ohio St.3d 621, 630, 605 N.E.2d 936, 943 (1992); *Maxey v. State Farm Fire & Casualty Company*, 689 F.Supp.2d 946, 953 (S.D.Ohio 2010)).  "The test, therefore, is not whether the defendant's conclusion to deny benefits was correct, but whether the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial."  *Id.* (*citing Thomas, supra*, 974 F.2d at 711).

In the instant case, there was no factual dispute as to coverage.  Delays were inherent in handling Plaintiff's claim due to the enforcement of Defendant's obligation to investigate.  Defendant is hardly guilty of lacking good faith because it did not deny coverage sooner.

A reasonable jury could find that denial of Plaintiff's claim for benefits was incorrect.  However, the key to denial of Plaintiff's claim is Defendant's finding that Plaintiff cannot collect the proceeds of an insurance policy providing coverage for loss by fire for the reason that the

13

decision was based on reasonable evidence that was neither arbitrary nor capricious. Beyond the contention that Defendant wrongfully denied his claim, Plaintiff has asserted no facts sufficient to sustain a claim of "lack of good faith" against Defendant.

> 4.     NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Plaintiff makes a generic allegation that Defendant's handling of his claim caused serious distress. Defendant argues that Plaintiff cannot make a prima facie claim for negligent or intentional infliction of emotional distress.

Ohio courts generally recognize causes of action for intentional infliction of emotional distress and negligent infliction of emotional distress. *Winkle v. Zettler Funeral Homes, Incorporated*, 182 Ohio App.3d 195, 206, 912 N.E.2d 151, 159-160 (2009)(*See Audia v. Rossi Brothers Funeral Home, Incorporated*, (2000), 140 Ohio App.3d 589, 592, 748 N.E.2d 587; *see also Niessel v. Meijer, Incorporated*, (2001), Warren App. No. CA2001–04–027, 2001 WL 1598325. To defeat a motion for summary judgment on a claim for intentional infliction of emotional distress, the plaintiffs must present evidence creating a genuine issue of material fact that they, among other things, "suffered serious mental anguish of a nature that no reasonable person could be expected to endure." *Id.* (*citing Callaway v. Nu–Cor Automotive Corporation*, 166 Ohio App.3d 56, 2006-Ohio-1343, 849 N.E.2d 62, ¶ 20). To prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove:

> (1) the defendant intended to cause emotional distress, or knew or should have known his actions would result in serious emotional distress, (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency, and can be considered completely intolerable in a civilized community, (3) the defendant's actions proximately caused psychic injury to the plaintiff, and (4) the plaintiff suffered serious mental anguish of a nature no reasonable man could be expected to endure.

*Copley v. Westfield Group,* 2011 WL 4346381, 4 (Ohio App. 9 Dist.) (Ohio App. 9

14

Dist.,2011) (*citing Shetterly v. WHR Health System*, 9th Dist. No. 08CA0026–M, 2009–Ohio–673, at ¶ 15, *quoting Jones v. White* (Oct. 15, 1997), 9th Dist. No. 18109)).  The Ohio Supreme Court has recognized the standard enunciated in comment d to Section 46 of the RESTATEMENT OF LAW 2D, TORTS (1965) 71, 73, in defining the concept of "extreme and outrageous": *Id.*  " * * * It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  *Id.* (*citing Reamsnyder v. Jaskolski* (1984), 10 Ohio St.3d 150, 153, 462 N.E.2d 392)).

Similarly, to defeat a motion for summary judgment for negligent infliction of emotional distress, the plaintiffs must present evidence creating a genuine issue of material fact that they "suffered serious emotional distress" as a result of a cognizance, or fear, of peril.  *Winkle,* at 206-207 (*citing Walker v. Firelands Community Hospital*, 170 Ohio App.3d 785, 2007-Ohio-871, 869 N.E.2d 66, ¶ 59, *citing Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 80, 451 N.E.2d 759)).  A court may decide whether a plaintiff has stated a cause of action for tortious infliction of emotional distress by ruling whether the emotional injury alleged is "serious" as a matter of law.  *Id.* (*citing Powell v. Grant Medical Center* (2002), 148 Ohio App.3d 1, 6, 771 N.E.2d 874, *citing Paugh*, 6 Ohio St.3d at 80 451 N.E.2d 759).  In *Paugh*, the Ohio Supreme Court explained that the term "serious" goes beyond trifling mental disturbances, mere upset or hurt feelings.  *Id.*  Serious emotional distress describes emotional injury which is both severe and debilitating.  *Id.*  Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."  *Id.* at 159-160 (*citing Paugh*, 6 Ohio St.3d at 78, 451 N.E.2d 759).

15

In the instant case, Plaintiff has failed to establish the existence of any genuine issues of material fact with regards to his claim for intentional infliction of emotional distress.  The evidence does not show that Defendant's failure to promptly pay Plaintiff's claim caused anything more than upset and inconvenience.  In his deposition, Plaintiff showed that he was agitated by his living situation but he never hinted that he was unable to cope with the mental distress resulting from his circumstances.  Plaintiff failed to describe emotional injury resulting from Defendant's purported breach of contract that was both severe and debilitating or describe treatment by a medical expert who can assist the judicial process in determining whether Plaintiff's emotional injury is serious.  There is no evidence of serious emotional distress which induced depression or other mental defect sufficient to prevent summary judgment in favor of Defendant.

Concerning Plaintiff's claim for negligent infliction of emotional distress, the Magistrate notes that an essential element is that the distress is caused by the plaintiff's fear of an actual physical peril.  Plaintiff's case is not one in which he was placed in fear.  The claim for negligent infliction of emotional distress fails as a matter of law.

## VII. CONCLUSION.

For these reasons, the Magistrate recommends that the Court grant Defendant's Motion for Summary Judgment, dismiss the case and terminate the referral to the undersigned Magistrate.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   October 8, 2014

16

**NOTICE**

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

17